We are now recording. Hear ye, hear ye, this Honorable Appellate Court for the Second Judicial District is now in session. The Honorable Anne B. Jorgensen presiding. Your Honors, the first case on the docket this morning is 2-22-0119, People of the State of Illinois, Plaintiff Appellee v. Jacob Headtke, Defendant Appellant. Arguing on behalf of the Appellant, Mr. Andrew T. Moore. Arguing for the Appellee, Mr. David S. Friedlander. All right, counsel, begin when you're ready. Okay, thank you. Good morning, Your Honors. First of all, I'd like to offer your condolences for passing Justin Tuzin. That said, may it please the Court. My name is Andrew Moore, and I represent Jake Headtke in this appeal. The State here failed to prove beyond a reasonable doubt that Jake was not in an involuntarily drugged condition at the time of his offense. Despite the State's failure, Jake was still found guilty after hearing improper evidence and arguments. In fact, the vast majority of the evidence used against Jake was entered in error through some 15 to 25 other crimes as propensity evidence, all but one of which was only supported by Jake's statements alone. Further, the State wrapped up its case by misstating the law and evidence surrounding involuntary intoxication, inserting its own opinion to discredit Jake's expert testimony, and repeatedly inflaming the passions of the jury by referring to Jake as an animal. That said, we're asking this Court to reverse Jake's conviction involving R.K. outright per Issue 1, and in the alternative, this Court could reverse and remand for a new trial per Issues 2 and 3, either singularly or cumulatively. Regarding whether or not the State Mr. Moore, during his testimony during the motion to suppress statements, the Defendant was asked whether or not he was on any medication, and he never mentioned Ambien. When was the first time that the Defendant disclosed to the State that he was taking Ambien at the time of the offenses? That would have been at his, right at the beginning, at his interrogation, it was mentioned. When did he mention Ambien? He mentioned Ambien? Ambien's not on the list of medications he mentioned. In his interrogation, when he denied having any knowledge of the activities involving R.K., he essentially, he was taking Ambien more at that time, so he offered that as a potential. I was referring to his motion to suppress testimony, his testimony under oath. He mentioned four medications and some vitamins, but never mentioned Ambien. I believe, if I'm remembering correctly, the question was, what was he taking at that time? And that testimony happened quite a bit after these incidents. He must not have recalled that he was taking Ambien then, because he didn't mention it, right? I believe, I could be wrong, but I believe the question was asking what he was taking at that time, when the question was asked. Okay, thank you. But Counsel, didn't he deny taking Ambien that night, like the first night involving R.K.? Was that his statement to Fossard? His statement wasn't that he denied taking Ambien, it was that he didn't remember if he did or not. The week in question, when he was babysitting R.K., he recalled having taken Ambien two nights out of that week, and that was one of the weeks where, that was the week where the initial allegation by R.K. occurred. Okay, so I thought, I mean, I've got a note here, and I'm going to look at the record myself, but I thought at 9.01 in the record, Fossard testified that he specifically asked the defendant if he had taken Ambien that night, and he said he hadn't. It was after that that he asked him if anything inappropriate happened, then he took a break, and then he came back and said he didn't remember, but R.K. was probably correct. Is that accurate? If it is, if that's what Inspector Fossard testified to, it's contradicted by the recorded statement. They chose not to record anything before that, so okay. In his recorded statement that was used at trial, and as far as what the jury heard, he said that he was unsure whether or not he, when he had taken Ambien, and he remembered taking Ambien two separate times during that period of time, and, you know, it's important to point out here, Jake's saying that he doesn't remember this, so what, and R.K. can't put a date on when this happened, so how could he possibly even remember if he took Ambien the night of when he doesn't remember when something happens? He recalled taking Ambien twice that week, and, you know, in increasing amounts over what he had taken previously after he moved into that residence, but the question I've got for you then is, you know, doesn't that put his state of mind into play? Doesn't that introduce his state of mind, and especially considering that the allegation here is that he repeatedly did these things, why isn't that admissible as to his state of mind? Forget, just setting aside propensity, right? He had multiple incidents involving the same victim, so let's just deal with that. I mean, he's claiming voluntary intoxication, but isn't the fact that he repeatedly made the attempts with his victim, doesn't that counter the voluntary intoxication, the fact that, or the assertion that you're making that this was involuntary? I wouldn't say that. There's nothing to preclude, you know, if he was experiencing the side effects, he could be engaging in the same activities repeatedly. There's nothing specifically about. But it's also activity that he consciously is aware of, and that he admitted to the police that he has a problem touching young boys in a sexual manner. And I'm glad you pointed that out, because that's exactly, that calls into question the state's case, because you can't just look at this, the other crimes evidence in isolation. You have to look at them in the context of this whole case. If we go back to November 4th, 2016, Jake's interrogation, it's important to remember that at the time Jake made his statement, he didn't know which case, if any, he would be prosecuted for. This interrogation involved three different kids, not just R.K. He did openly admit to investigators that he has a problem. And during the interview, he admitted to more serious and more numerous acts with J.K. and A.X. And most importantly, if you listen to that interview and read Bossart's testimony, Jake brought all of these, all of the activity with A.X. to him. He was forthcoming about that. He wasn't reported for these activities, but rather he told the investigators about this all on his own. So you have to ask yourself, in that context, why would he deny having any recollection of the least serious and the least numerous of the allegations against him? Why would he pick that to deny? But then admit to the investigators he has a problem. Admit to 10 to 20 other incidents involving a kid that they didn't even know about. It just doesn't make any, it doesn't follow any logical... You're essentially asking us to reweigh the evidence. I don't think it's reweighing the evidence. There's not really any reasonable explanation as to why Jake would have proceeded in this way. And that only supports his defense. If you take it in the context of his statement, when it was made and how it was made, it doesn't increase the likelihood that he committed the acts against R.K. It makes it less so, because why would he admit to all this other stuff? And it's not really asking to reweigh the evidence. Obviously, you have to take this evidence in light most favorable to the state, but you also have to take references or you have to... Any kind of assumptions that the record requires you to make in the defendant's favor, you have to make those as well. So I wouldn't say this is necessary reweighing the evidence. It's more, look at this evidence and how it came out. And does that... And remember, the complete extent of the state's case against Jake was this other crimes evidence. And R.K.'s testimony that the events occurred, but Jake never denied that they occurred. It was just... As well as the defendant's own testimony that he had a problem with touching young boys. Right. Yes. He has admitted that and he is... So your argument is that by coincidence, while he's taking Ambien, he touched this child sexually multiple times. It's not by coincidence. And I'm not saying that the average person taking Ambien would touch kids. He's acting out in an unconscious manner through his admitted predilection to having sexual interest in children. A normal person engaging in this kind of unconscious activity would act out in ways that they would naturally seek. What about the testimony that... And the argument of the state that if this were true, his eyes would have been open. He would not have been pretending to be asleep. His eyes would have been open if the contact was as a result of his taking Ambien. That's not... The statement is misstating the expert. Well, didn't the doctor testify, the defense expert testify that this usually happens when the eyes are open? When people appear to be... They appear to be conscious. So how it happened, and I believe it's 1054 of the record, maybe. That's off the top of my head. The state asked if somebody may... The state themselves use the word may appear to be asleep when experiencing a state of automatism. The answer was yes, they may be. And then the state asked, isn't it true that their eyes would be open if they're sleep driving? And the answer was yes. So sleep driving is different because obviously your eyes have to be open in order to effectively drive a car. Your eyes don't necessarily have to be open to engage in other types of unconscious activities. And again, the R.K. testified he always appeared to sleep. He never responded. He never verbalized anything. In other instances that he admitted, he tried to mitigate his activities by talking to the mom and talking to him about... Talking to J.K. about appropriate touch. When he admitted that he purposely touched him, he tried to mitigate. There was none of that here. So you have to look at this evidence and ask what shows that J.K. was awake. The state hasn't produced anything aside from these other crimes that aren't necessarily probative to show that he was awake and conscious at the time that these... But he repeated the same behavior. The same behavior. Not like getting into a car and driving the car. He repeated the same sexual behavior. And it's important to note that this behavior is... There are differences between... Okay. And isn't that up to the jury to decide? It's up to the jury to decide. But it's also up to the appellate courts to determine if, given this evidence that the state presented, could any rational jury have come to this conclusion. And my argument is that they couldn't. They only came to that conclusion because of this improper other crimes evidence and improper arguments by the state that allowed them to by misrepresenting what the law is surrounding inviolable intoxication. So, counsel, let's move to the closing. You alleged that the references to the wolf in sheep's clothing makes... What about that makes... Made the trial unfair? So, the appellate court's been pretty clear with this... It's fortuitous in this line of work that you have such clear case law and some kind of random story convention, such as the wolf in sheep's clothing. But even beyond that, the Illinois courts have made it clear that you can't refer to other things like was seen in Liddell, where the state merely asks, have you heard of this story, the wolf in sheep's clothing? In Liddell, where the state went wrong is they cast the defendant specifically as the wolf in the story and they cast the victims as the prey. And in this case, peppered throughout the closing arguments and rebuttal, the state's constantly going back to this, constantly referring to Jake as an animal. He's... Counsel, if we were to assume that was error, can you tell me where the prejudice lies? The prejudice is that defendants facing the types of accusations that Jake is facing, he's admitted that he has a but in the jury's eyes, it's extraordinarily difficult for a defendant facing charges involving child sex offenses to overcome even the most basic biases that the jury has. But then if the prosecutor goes further and is dehumanizing him to the extent where he's now a wolf preying on children, that's just harnessing that innate instinct that we have as a society to be repulsed by these types of activities. And it's harnessing that rather than focusing on the evidence of the case. And that's really where the prejudice lies there. Well, you also have this, you have not established that the evidence was closely balanced, have you? This is not a case where you don't have extrinsic evidence supporting the state's theory. You have the defendant's admissions and other crimes evidence. I would say that this is a class closely balanced because the entire case came down to whether or not the jury believed Jake's testimony and his expert witness. The defense never really challenged our case or that anything didn't happen. So his credibility is intact. What the jury had to decide was whether or not they believe Jake. And that alone should make the case closely balanced, especially when the state and its arguments and through improper other crimes evidence are attacking Jake's credibility in improper ways. So when everything comes down to credibility and the state's doing proper things that point towards that credibility, that's when the case becomes closely balanced and there should be a reversal. You just acknowledged that there was other evidence. You had the defendant's statements and other crimes evidence. That takes it out of the realm of closely balanced. It's not just our case testimony against the defendant's testimony. There's corroboration for what R.K. testified to. That does not meet the definition of closely balanced. I disagree with that, your honor, because whether or not R.K.'s testimony is corroborated doesn't matter in this case. The Supreme Court has said repeatedly, the Supreme Court and this court has said repeatedly, closely balanced is where the evidence is. You have statements or you have evidence from the defense that is not corroborated and evidence from the state that is not corroborated. That is a case where you could say it's closely balanced. Here you have corroboration, extrinsic evidence supporting the case and that's it. It doesn't meet the definition of closely balanced. I don't think that you can just look at other crimes and say, oh, extrinsic evidence is not closely balanced. You have to look at the context of that other evidence. In this case specifically, I'm not saying all cases across the board, but in this case specifically, there's nothing about the other evidence that because Jake has admitted to all the other crimes, but this one crime he's denying having recollection to, he's not saying it didn't happen or not, that other crime's evidence isn't as valuable as if Jake is flat out denying something happened. The other crime's evidence goes to, yes, yes, your honor. I appreciate that you have lost video, but your time is up and you will have an opportunity to respond to the state momentarily. In the meantime, Justice Burkett, did you have any other questions at this time? No, thank you, Judge. Justice Kennedy? No. All right, then I believe it was- Thank you, your honor. Freedland, you are ready to proceed. Yes, your honor. Thank you. My name is David Freedland. Good morning. I represent the people of the state of Illinois. Happily, in this matter, of course, I join my colleagues' earlier statement offering condolences for Justice Hudson's past. That is greatly appreciated. May it please the court. I think your honor's viewed the evidence right there. As far as his sufficiency of the evidence claim, the evidence in this case is absolutely overwhelming. It's not a closely balanced case at all. In his reply brief, defense counsel is not contesting the veracity or the credibility, and those are his words of R.K. Can I ask you this? I seem to hear counsel saying that at the trial level, there was really no contest about what R.K. said, corroborated to the extent of the hearsay statements coming in. His point seems to be that the whole crux of this case is the state's failure to disprove his involuntary intoxication. In other words, those events might have happened, but I'm raising an affirmative defense that I was unaware of the consequences. Could you focus your argument more on that, please? First of all, the jury was properly instructed here. They're not raising any claim of improper jury instructions. The jury was instructed that to prove the defendant guilty, the fourth proposition was that at the time of the offense, the defendant had to have the substantial capacity to appreciate the criminal conduct of his actions or conform his conduct to the requirements of the law. The jury was instructed correctly. In order to find him guilty, they had to find that he was acting voluntarily or knowingly and appreciated the consequences of his actions. Going back to, I'm not focusing on it, but as to in the light most favorable to the state, they heard his claim that he was taking Ambien, his assertions, and they just rejected it. It was within their province as the determinations of the credibility of witnesses to believe him or was able to get the instruction. Defense counsel says that. He says that in his reply brief, we had one of the ways that the state could have disproved or proved beyond a reasonable doubt that he was aware of the consequences of his actions or that the defendant was actually conscious or that he was not involuntarily intoxicated. Basically, that's, was he faking? The jury heard Dr. Stefanik's testimony, and I believe it was a rational inference that for the sleep his eyes would be open. They got to hear R.K.'s testimony that yes, his eyes were closed, but the repeated movements over and over again on multiple occasions cast doubt on the thought that perhaps he was really involuntarily doing this. And that's back up to the insurer. Yeah. So, doesn't the argument in the closing contradict the instructions like 1053 and 1054? Yes. Nobody forced the defendant to take it. No one opened his mouth and put it down there and made him take it. Is any of that actually an accurate reflection of the jury instruction? Well, I think it's partially correct. I mean, that is one of the involuntary intoxication defenses is that he had to be forced, and that's true. If you look at what was said right before that statement, the first day the prosecutor reviews the entire jury instruction, which included the issues instruction and included that he had the substantial capacity, he had to have the substantial capacity to appreciate the consequences of his actions. Counsel also, for the state, also referred that he was taking the Ambien knowing full well how it affected him since March of 2015. And so they have that. While the statement there is not an inaccurate statement of the law, it's one portion of the law. And I'd also point your honors to the fact that in the defense's closing argument thereafter, they clarified and went right back and addressed that. And the defense counsel said that what state talked about, he wasn't forced, it wasn't rammed down his throat. Well, that's not the only situation. These side effects that Dr. Stefanik talked to you are hard to gauge even for the professionals. And then they went on and so forth. And this is page 1, 1083 of the record and addressed that the possibility that automatism is a side effect of taking the Ambien. They also then continued that you can't impugn to the defendant that he would know that this was going to be a side effect and therefore did this purposefully. So if the state inaccurately or partially stated what was necessary for the involuntary intoxication instruction, it was cured by defense counsel's response. And more importantly, as I said in the beginning, the most important thing that governs is that the jury was instructed correctly. And that that proposition was included that showing that the crux of the case was that he had to know that he had to appreciate and have the capacity to understand the consequences of his actions. All right, counsel, just to move on to the other crimes, I want to ask you what, how did the other crimes in each of these, so you've got other crimes with the same victim, other crimes with JK, other crimes with AX, and then RW. So how did each of these satisfy the statute? Well, the crimes with, they're all through defendant's statement with the exception of JK. The statute says you have to have specific instances of conduct. The specific instances, there isn't a requirement that it come from the abuse E, so to speak. The defendant, what better and more reliable evidence is there than the defendant's own statement sort of unprompted that he provided these individuals to the officers. So I'd certainly say the factual similarity, as I detailed in my brief, is absolutely frightening. It goes exactly to his sort of modus operandi of what he's attempting to do with these individuals. And the court, although not an extensive analysis, indicated it weighed the probative value versus the prejudicial effect. And it's undoubted that this is prejudicial, but it's extremely probative given the defendant's, given his defense in this case. The fact that he's putting his intent at issue with this one crime, this one offense, and this one boy, makes all of the other offenses and the other acts that he did do it where he was not on Ambien and extremely probative and relevant to his intent. And Justice Kennedy, you asked opposing counsel whether or not he had been asked if he was on Ambien at the time of the offense on page 901. That was the time he was referring to JK. That question was specifically asked with the not RK, but JK. So he's asked by the police officers, during these other offenses that you're telling us about, were you on Ambien? No, I was not. Well, this paints an entirely different picture and corroborates RK's testimony that he thinks that the defendant was faking, and that goes to the jury's determination of credibility. Well, what about, so R.W., for example? Sure. Brief colloquy in the interview, you mentioned 10 to 20 times. Do we have any indication of what R.W.'s age is? What exactly the physical acts were? Just to be clear, it's Anthony is the 10 to 20 times. R.W. was one boy, I believe, in the car. Offhand, I can't. He specifically said with Anthony that the boy was, I believe, he says, how old was Anthony when that happened? I believe six or seven. So you've got six and seven for Anthony. He was asked how old was JK at the time, and JK was seven and eight, and RK is, I believe, 10 if you do the math at the time. So they're all within the same age. They're all within similar time frames. He indicates, as your honors heard, that he had a problem abusing boys, and he wanted to see a psychiatrist about it. So all of this goes to his intent, and for the sufficiency, at least, it certainly satisfies, certainly supports the finding of guilt. I would point out also that, as your honors indicated, the defendant got to, additionally, some of the things that defense counsel noted was that we don't have to credit defendant's statement that why would he say that he did all the other ones, but not RK. He voluntarily abused all the other individuals, but not RK. No one can speculate as to why a serial child abuser would have done one, why the statements he makes. I mean, it's impossible to get in the head of this defendant, but perhaps he had some affiliation with the family. There was close friends with the grandmother. There's multiple reasons as to why he might just say, as it goes to RK, I didn't do that, or I don't remember doing that one, but yes, I did all the other. Additionally, if you look at his evidence of his intent, not really addressed much during the trial, but right after he's confronted by RK's mother, he says he disappears. She says, I want to talk to you right after RK's disclosure, and then he says, I'm leaving. He's gone, and then he never addresses them, and where is he? You know where he is. He's then starting to move over into JK's house because that disclosure and police report was filed afterwards, so his consciousness of guilt is fleeing the scene immediately after being confronted by RK's mother, and RK provided an ongoing description of the methods that this defendant was using, the excessive hugging, the excessive kissing, the excessive, and then three instances of touching, or three instances, I should say, of sexual conduct. That was his testimony on the stand, so certainly as to the sufficiency and defendant's intent, the jury didn't buy it as evidence to their verdict, and so we would ask you to affirm the guilty finding. Well, can you respond to the argument that the state crossed the line in referring to the defendant as a wolf in sheep's clothing, and the state did it right out of the box. This was not something that was invited. It was an opening close, the first few words out of the prosecutor's mouth where the defendant was a wolf in sheep's clothing. Sure, and I think that the counsel was clearly trying to draw the metaphor that he was as a wolf in sheep's clothing, that he appeared in the cases to, or in his actions, to ingratiate himself with the the victims. That's what I responded with in my brief, to get into the family, to get into the houses, and ingratiate themselves so he could surreptitiously abuse these boys, but you're right. You can't do that, and when is that message going to hit home? The prosecutors have to stop referring to the defendant as an animal. I fully agree that it's an artful, and it shouldn't be done. The case law is clear, but then it goes, as your honor pointed out, to it comes down to how was he prejudiced, and simply in this case, this isn't a closely balanced case, and he isn't prejudiced. So with that, your honor, that's the response I have for your honor's question. If there's any others? Well, counsel, when do we pick a case and reverse it on simply the closing argument of the state? When do they appreciate our point? Well, I will anxiously await that case. However, here, this is not that case. The defendant's statement, to reverse this case based on the comments and closing argument, I don't believe is warranted, your honors. How about a letter from the state's attorney appellate prosecutor to the state's attorneys in the Your honor, I'm happy to relay the message. I believe that counsel, in speaking with the counsel, was concerned. Trial counsel, in speaking with trial counsel, they recognized the questionable nature of that comment. I think that that message has been received, but of course, I will relay your honor's comments, or I'm sure you can address that. I'm sure it will be addressed in whatever disposition your honors set forth. It may appear in this disposition. Mr. Excuse me, Justice Burkett, any further questions? Thank you, Judge. Justice Kennedy? No, thank you. No further questions. I would urge you to go back on the phone, and I'm not exactly sure how to do that. We can see you. Yeah, I've got audio on my phone and video on the computer. All right. If we have an echo, we'll let you know. You may proceed when you're ready, sir. So, I just wanted to touch on a few points that the state made here. So, their argument is the jury was properly instructed. So, they were properly instructed that, you know, the four elements of this case, he had to do it, and they were properly instructed on what is a drug condition. The state undermined those instructions because there's nothing in the instructions that explicitly state what the holding in Hari is, is that taking a prescription as prescribed by your doctor, and you get unintended effects, that's involuntary intoxication. The state undermined those instructions by eliminating that by saying he had to have taken it accidentally or forced to have been taking it. So, the instructions can't remedy everything, and if defense counsel argued against it, the jury might not have believed it. The judge says, you know, these are arguments. They may have believed the state, and that's why they found Jay guilty. We don't know. So, you can't just do what the state always does and eliminate these improper statements of law through jury instructions because the jury does pay attention to them. And counsel alluded to the fact that Jay knew of the side effects of Ambien in 2016, March of 2016. But let's talk about that for a little bit. He was prescribed Ambien in 2015. His interview took place in November of 2016. The state itself, the defense didn't do this, the state itself motioned to exclude any statements about Ambien made during that statement. Which was granted. So, it was the state's decision to remove that from the defendant's statement. It's removed from the transcript, and it should have been removed from the audio as well. So, that's not something that the jury would have known. And going to the other crimes evidence, I didn't get a chance to talk about that, but I'll respond to your questions and the state's arguments. So, the 10 to 20 incidents involving AX, those are clearly invisible because we have no facts as to what occurred. He described one instance in this court, this district, in fact, in People v. Sundling, held that a certified copy of a conviction alone can't be used to show other crimes evidence because there's no facts compared to the instant offense. That's exactly what we have here. We have 10 to 20 instances used as other crimes. The state relied upon them. There was testimony throughout the trial about them. But we don't have anything to compare it to. So, the judge was clearly in error for allowing those. And then there's a second tier. Aside from your argument about other crimes evidence, the state is entitled to introduce any admission by the defendant that would have a tendency to establish an element of the offense. Doesn't it come in under the exception to the hearsay rule as an admission? I would argue that if that's how the state chose to raise this, that it would only be allowed to use his statements regarding the instant offense and not other crimes. Once you get into other crimes, you have this added layer where the judge has to weigh the probative value or the prejudicial value, especially when it's used for propensity. What better evidence of propensity is there than the defendant's own statement that he has a propensity to commit these types of offenses? What better evidence is there? Again, you have to look at the context of how those statements came about. It doesn't make sense. He has an admitted propensity for this. He's apologized, asked for help. He knows that he's wrong. Here's an example. A defendant denies committing a particular sexual assault against a specific victim. Then, in a letter that he's written, he apologizes to that victim, but he also mentions that he had done the same thing to several other victims. Would that letter be excluded because he mentions other victims, or does it come in? I don't think it could be redacted to include other victims. Well, here the defendant apologized. He said he was sorry that R.K. was not lying, but he denies that he committed the acts consciously or intentionally. Correct. He established that in 2016 without knowing that he would be charged with this offense. His story never changed. His story never changed with J.K. He pled guilty to those. The state didn't charge him with anything else. He pled guilty to an attempted J.K.'s case. That probably more has to do with the state's inability to prove up its charges against J.K. because, as you know, he admitted to certain things in his statement, and J.K. ultimately denied them. That gets into this other crimes evidence in general. The judge blanket admitted everything, not knowing what the state would be able to corroborate or prove up. It would have been more appropriate to reserve ruling on what can come in until they see what the state can corroborate, and then treat his statement, redact portions of his statement that the state hasn't proven up. The state's evidence directly contradicts portions of his statement, the victim saying nothing happened. For somebody in J.K.'s position to have, for the jury to hear he's done this 10 to 20 times with no specifics, they're going to speculate and fill in the gaps. It's going to become a worst-case scenario. It's the same as a certified conviction, which can't be used. It's important to note that the courts have held that when other crimes evidence comes in error, it's rarely, specifically for reasonable doubt, that with the proper evidence, they still could have found him guilty. The only evidence here is other crimes evidence. It's impossible to separate the improper other crimes evidence with anything you determine to be proper because we don't know which the jury you know, grabbed a hold of. Unless you have any other questions, I see that my time's up. Justice Burkett? No, thank you, Mr. Moore. Thank you, Judge. Justice Kennedy? No, thank you, counsel. Well, then I thank you both for excellent arguments this morning. We will issue a written decision in due time, and we are adjourned. Thank you. Thank you. Sorry about the audio issues. Oh, don't worry about it. Is that Joe? I'm here. Okay, not you, Joe. I wonder, just wanted to make sure who law clerk was it. It wasn't someone from one of the agencies. Greg, stop the recording. Thank you, judge.